# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:18-CR-00281 |
| | (Judge Brann) |
| v. | |
| JEFFREY G. BOYD, | |
| Defendant. | |

## MEMORANDUM OPINION

### FEBRUARY 11, 2019

## I. BACKGROUND

On August 21, 2018, Jeffrey G. Boyd ("Boyd") was indicted on one count of

violating 18 U.S.C. § 922(g)(8), which states:

> (g) It shall be unlawful for any person—
>> (8) who is subject to a court order that--
>>> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>>> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>>> (C)
>>>> (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>>>
>>> by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury;

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Boyd was indicted after a complainant lodged a complaint with the Pennsylvania State Police ("PSP"), who ultimately turned the case over to the United States Secret Service. Boyd has a date certain trial set for March 18, 2019, and in advance of trial, has filed several motions, including a motion to suppress, the subject of the instant Memorandum Opinion. An evidentiary hearing was held on January 31, 2019. Following the hearing and a review and consideration of the submitted briefs, the motion to suppress will be denied for the reasons that follow.

## II. DISCUSSION

### A. Facts elicited during the January 31, 2019 Suppression Hearing

At the suppression hearing, law enforcement officers who interacted with Boyd on July 31, 2018 testified as to their personal involvement with the case. PSP Corporal Jason Rasmus ("Rasmus"), PSP Trooper Richard Evans ("Evans"), PSP Trooper Gabriel Paduck ("Paduck"), Secret Service Agent Brad Kidder ("Kidder"), and Secret Service Agent, David Baker (the lead case agent) testified at the hearing cogently and credibly. The testimony elicited the following.

On July 31, 2018, at around 4:00 p.m., a private individual, Kathryn Kelchner ("Kelchner"), arrived at the PSP Shickshinny barracks. She first spoke with Trooper Evans and told him that a man previously unknown to her, had

arrived unannounced on her doorstep the prior day and introduced himself as "Jeff

from Tulsa" (Boyd). She recognized his name as one of her Twitter followers,

although she had never met him in person. Boyd told Kelchner that he had driven

twenty-two hours straight from Oklahoma with "one hell of a story to tell her."

Astonishingly, she agreed to meet this stranger for lunch the following day (July

31, 2018) at a local restaurant.

Kelchner relayed to Evans that during the lunch, she became concerned

about Boyd's mental health. She later wrote in a statement to police that she

> immediately got the feeling he is suffering from schizophrenia but doesn't know it. He was responding to voices in his head, crying, and returning to 'normal.' He asked me if I can 'hear her.' That she's talking and laughing. I assured him I can't hear 'her.' He told me has 6 voices in his head and he believes he's MK Ultra and that the CIA is sending messages directly to his head.
>
> He said the voices told him I was kidnapped. I surmise he drove from OK to make us safe??
>
> As we were eating he then said the voices are telling him to 'Go to DC and kill the President, Donald Trump, Jr., Jared Kushner, and Ivanka Trump.' (verbatim)
>
> When he excused himself to the bathroom I went to my truck to get my cellphone off the charger to get that info recorded. I questioned him about it on tape now and he then only admitted to Don Jr. and Jared. I think he might have suspected he told the wrong girl. I have audio of the admissions about Don Jr. and Jared but he would not repeat what he said earlier about POTUS.[1]

---

[1]    Defendant's Exhibit 117.

Corporal Rasmus was the on-duty supervisor at the Shickshinny barracks that afternoon and Evans promptly advised Rasmus about the situation. Rasmus met with Kelchner and listened to the recording that she had on her cell phone.

During the recording, Boyd can be heard saying to Kelchner that he had thought that the NSA or CIA was providing Kelchner a "realtime" view or "feed" of his computer desktop screen.[2] Kelchner then said to Boyd, "Well, they're messing with you hard core if they want you to go to D.C. and kill the President for God's sakes."[3] Boyd replied "[Inaudible,] Jared Kushner and Donald Trump, Jr. at this point."[4] "Not the President?"[5] Kelchner asked. Boyd replied "No he's a fuck [inaudible.]"[6]

Rasmus became concerned Boyd was experiencing a "mental health issue" for several reasons – the statements Boyd made on the recording; the statements Kelchner relayed that Boyd had made prior to her beginning the recording; and the fact that Boyd had driven from Oklahoma unannounced to see Kelchner, a stranger. Rasmus testified that while listening to the recording he believed that

---

[2]  Government Exhibit 12 and Defendant's Exhibit 112.

[3]  *Id.*

[4]  *Id.*

[5]  *Id.*

[6]  *Id.*

there was a "fight within two people" in Boyd. Rasmus dispatched Trooper

Murtha in a patrol vehicle to find Boyd and followed behind in a separate vehicle.

Rasmus and Murtha ultimately located Boyd at a Giant Food store parking

lot in Berwick, Pennsylvania. The parking lot was a commercial area with

customers and employees going in and out of the various businesses. Rasmus

called PSP Bloomsburg for back up, and he and Murtha approached the Boyd

vehicle. Their weapons were drawn, but lowered, based on their experience with

people with mental health issues, who, as Rasmus put it, can "go from good to evil

quickly."

Boyd's vehicle, an F-250 pickup truck with Oklahoma tags, was running and

Rasmus saw a white male slumped over the steering wheel. Rasmus knocked on

the window and Boyd woke up. Boyd rolled down his window only slightly

because there were barking dogs in the truck with him. Rasmus identified himself

to Boyd and told Boyd he was there to "check on his well-being."[7]

---

[7] What happened next, that lead to the discovery of Boyd's weapon and ammunition is subject of dispute. As such, I digress from solely reciting the facts, and intertwine some of Boyd's legal argument, as to this point.

Rasmus testified credibly as to the sequence of events. However, Boyd's counsel argued at the hearing that because Rasmus didn't file a supplement to the incident report until December 13, 2018, seven days after Boyd filed his suppression motion, that any testimony or documentation regarding the discovery of Boyd's loaded gun and two loaded magazines is 'dropsy testimony.' I respectfully disagree.

When Professor Irving Younger wrote an opinion during his tenure as a judge of the New York City Civil Court criticizing the advent of dropsy testimony after the United States Supreme Court decision in *Mapp v. Ohio*, 367 U.S. 643 (1961) that announced the now well-known exclusionary rule, he was concerned that New York City police officers were perjuring

themselves at hearings. *See People v. McMurty*, 64 Misc. 2d 63, 64, 314 N.Y.S.2d 194, 195 (Crim. Ct. 1970). Younger believed that law enforcement would illegally seize evidence and then at a hearing prevaricate and testify that 'the defendant dropped the evidence' so that the illegally obtained evidence would not be excluded in violation of the Fourth Amendment to the United States Constitution.

I do not find that Rasmus's testimony was dropsy testimony. Every officer who provided a written report stated that the contraband was seized during an inventory search.

The initial incident report was completed on August 1, 2018 by Trooper Paduck, who was not present when Rasmus and Murtha found Boyd in the Giant Foods parking lot, interviewed him, and found the loaded gun and loaded magazines. So, as an initial matter, Paduck's recitation of how the gun was discovered is a second-hand recitation.

Paduck's August 1, 2018 reads as follows:

Corporal Jason RASMUS responded to the location and took ACCUSED into custody. An inventory search of ACCUSED's vehicle was conducted prior to being brought to PSP Shickshinny. A Springfield Armory model XDS .45 ACP caliber pistol was located in the vehicle. The pistol was loaded, and two extra loaded magazines were also located in the vehicle. The pistol, magazines and ammunition were transported to PSP Shickshinny and entered as evidence.

Additionally, in the federal criminal complaint, again, a second-hand recitation of the events, Agent Baker had written:

(8) Continuing on 7/31/2018, troopers from PSP-Shickshinny immediately undertook a search for BOYD, which effort led them to the parking lot of Giant Foods Berwick, Columbia County, PA, where the subject was located sleeping in his vehicle. BOYD was taken into custody for purposes of an involuntary mental health evaluation pursuant to Section 302 of the Pennsylvania Mental Health Procedures Act, and BOYD's vehicle was impounded.

(9) Troopers conducted an inventory search of BOYD's vehicle and recovered, amongst other of BOYD's personal property, a loaded Springfield model XDS .45 ACP pistol and two (2) extra loaded magazines from the vehicle's center console. Later the same evening, troopers elected to charge BOYD with violating Title 18, PA Crimes Code, §2706(a)(1) (relating to terroristic threats). As of this filing, BOYD remains in the Columbia County Prison pending resolution of the state charges.

Although the secondhand recitations of where in the truck the gun was first seen conflict with Rasmus's first-hand account, all three reports are consistent and corroborate the fact that the gun and magazines were seized during an inventory search. Rasmus testified that the guns and

Because the dogs were causing a commotion, Rasmus asked Boyd to step out of the vehicle to speak with him. Rasmus asked Boyd if he had any weapons in his vehicle, to which Boyd quickly replied 'Yes, I have a pistol.' Boyd went to reach for it, and Rasmus told him not to. Boyd opened the door to step out of the truck, and Rasmus saw two magazines for the firearm in the inside door pocket.

Once Rasmus heard about the pistol and saw the magazines, the alleged threats to the first family became more serious to him. He stated that what began as a mental health issue now was also a terroristic threats issue. He testified that the gun and ammunition "added a lot more" and "upped the ante" because in his mind there was no longer just a threat, but now there was also a means to carry out that threat.

Boyd sat on the tailgate of his truck and had a conversation with Rasmus. Rasmus testified that Boyd would periodically "click over" and tell Rasmus about the MK Ultra experiment and about hearing voices in his head. Rasmus testified that Boyd would go "back and forth" from being "normal" to hearing voices in his

---

magazines were seized during the inventory search to secure the vehicle overnight. His report is not a post-hoc justification of the seizure, nor an alternate explanation of the seizure. His report instead clarifies that he had both knowledge and a visual of the gun and magazines prior to the inventory search, but that they were only seized during the inventory search.

head.  This conversation made Rasmus even "more convinced" that Boyd was experiencing a mental health issue.

Rasmus told Boyd he was not under arrest, but that he needed to handcuff Boyd in order to transport him to the Shickshinny barracks.  Rasmus acknowledged that Boyd was certainly "in custody" at this point.   Initially, Rasmus planned to leave the truck in the Giant Foods parking lot overnight.  In accordance with PSP protocol, he asked Boyd if there were any valuables in the vehicle that the PSP should secure.  Murtha seized the gun and magazines, in addition to a knife and Boyd's wallet.  PSP Bloomsburg took the dogs to a safe location.   The exhibits at the hearing including a picture of the magazines, including a third magazine that was in the gun.  Between the three magazines, there was capacity for seventeen bullets; the PSP unloaded sixteen.[8]

Once Rasmus and Murtha returned to the barracks, Rasmus turned Boyd and the case over to Trooper Paduck in the criminal investigation unit and was essentially uninvolved with the case after this.  He did, however, send a trooper to recover Boyd's truck from the Giant Foods parking lot and hold it in the PSP impound lot because he had "promised" Boyd that he would not incur any towing fees.

---

[8]    Government Exhibits 5 and 6.

Evans 'Mirandized' Boyd and had Boyd sign a waiver of rights form[9] at 7:10 p.m.  Evans did not ask Boyd any questions relevant to the case, he only asked Boyd if he was hungry or thirsty.

Agent Kidder, and another Secret Service Agent, Tim Farnsworth, interviewed Boyd for about a half-hour to forty-five minutes.  Kidder is in Protective Intelligence with the Secret Service.  Although based in Philadelphia, Kidder was in northeast Pennsylvania in late July because he was part of an advance team preparing for an upcoming visit from President Trump.  The President was due to speak at an August 2, 2018 rally in Wilkes-Barre for United States Representative Lou Barletta's campaign for the United States Senate.  Baker contacted Kidder to let him know there was a man in custody who had made threats against the life of the President, Donald Trump, Jr., Ivanka Trump, and Jared Kushner and asked Kidder and Farnsworth to interview this individual.

Kidder's goal in interviewing Boyd was to manage the risk to the first family.  Kidder was concerned because "the fact that someone travelled so far to an area so close to one of our future visits and also saying threats that they are going to kill the president is obviously a red flag."

Kidder further explained that he always asks interviewees about their home life as part of his risk assessment process.  He learned that Boyd is divorced and

---

[9]    Government Exhibit 9.

that his son and ex-wife had a protective order against him. He also learned that one of Boyd's best friends had stopped talking to him within the past year, and that Boyd had lost his job the previous year.

Kidder further testified that he always asks interviewees if they own or possess firearms or other weapons. When he asked Boyd this question, Boyd responded that he owned a 1911, a Glock, one 20 gauge, and two 410 shotguns.

Kidder also had concerns about Boyd's mental state. Boyd told Kidder that he had been tracked on a CIA program called blue whale, and that he thought a Russian program was hacking him. Boyd also told Kidder he heard voices in his head.

Kidder closed the interview by having Boyd sign standard medical and financial release forms. Kidder testified that he did not direct the PSP to arrest Boyd, and that, in fact, he did not have the authority to do so. He turned the case back over to the local case agent, presumably Baker, and has had nothing to do with the case since.

While Kidder was investigating Boyd, Paduck spent his time contacting the on-duty Columbia County assistant district attorney to ask if the Commonwealth intended to prosecute Boyd for making terroristic threats. Paduck testified that no one in the Secret Service directed him to do so, nor did the Secret Service have any authority over Paduck. Once Paduck received approval to charge Boyd, he typed

the criminal complaint affidavit in support of the charge based on the totality of the circumstances – the audio, video, and loaded firearm transported from Oklahoma to Pennsylvania.

Rasmus again became involved later in the night at 11:49 p.m., as he aided Paduck in transferring Boyd to be arraigned by a district magisterial justice. They arrived in Danville at 12:30 a.m. At 1:00 a.m., following the arraignment, Rasmus and Paduck then transported Boyd to the Columbia County jail, where they arrived at 1:12 a.m.

### B. Burden of Proof

"The burden of proof is on the defendant who seeks to suppress evidence."[10] If the Defendant establishes a valid basis for his motion, the burden shifts to the Government to show that the search and seizure fit within an established exception to the warrant requirement.[11] Boyd makes several arguments as to why the evidence against him should be suppressed; each will be taken in turn.

### C. Probable Cause to Arrest

Preliminarily, "it is [] well established that in order for an arrest without a warrant to be constitutionally valid, it must be supported by probable cause.[12]

---

[10]   *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (*quoting United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (internal quotation marks omitted)).

[11]   *See, e.g. United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir. 1992).

[12]   44 Am. Jur. Proof of Facts 2d 229.

Officers may make warrantless arrests in public places when the officer has probable cause to believe that a crime has occurred.[13]

Probable cause was defined by United States Supreme Court in the 1961 decision *Beck v. Ohio*. The existence of probable cause depends on whether, at the moment the warrantless arrest was made, the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.[14] Importantly, "probable cause need only exist as to any offense that could be charged under the circumstances."[15] The Government has the burden to show the existence of probable cause.[16]

Boyd argues that the PSP did not have probable cause to arrest under Pennsylvania's Terroristic Threat Statute, which states, in relevant part: "(a) Offense defined -- A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to (1) commit any crime of violence with intent to terrorize another."[17] Boyd argues that the statements he made to Kelchner did not express an intent to harm another. Therefore, no

---

[13]  *Florida v. White*, 526 U.S. 559, 565-66 (1999).

[14]  *Beck v. Ohio,* 379 U.S. 89, 91 (1964).

[15]  *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) *see also Edwards v. City of Philadelphia*, 860 F.2d 568, 575–76 (3d Cir. 1998).

[16]  *See Wong Sun v. United States,* 371 U.S. 471 (1963).

[17]  18 Pa.C.S.A. § 2706 (West).

reasonable officer could have believed that the statements were made with an intent to terrorize President Trump or his family.

Rasmus's testimony, coupled with Kelchner's statement and the audio recording on her phone, demonstrate that there was probable cause to arrest Boyd on state terroristic threats charges. Kelchner's witness statement sets forth that Boyd told her he was planning to kill the President and his family. The audio recording corroborates Kelchner's report that, according to Boyd, voices in his head told him to at least target Donald Trump, Jr. and Jared Kushner. Rasmus testified, and the exhibits confirm, that Boyd was carrying a loaded weapon with two additional loaded magazines. This testimony and evidence gave Boyd a means to carry out the threats made.

The elements of the Pennsylvania statute have been met: "A person [Boyd] commits the crime of terroristic threats if the person communicates, either directly or indirectly [to Kelchner], a threat to commit any crime of violence [kill] with intent to terrorize another [the President and/or his family]." Consequently, I find that there was probable cause for the PSP to arrest Boyd.[18]

---

[18] Because I find there was probable cause to arrest, I need not turn to Boyd's next argument, that there was not probable cause to detain Boyd under Pennsylvania's Mental Health Procedures Act.

**D. Search of the Vehicle**

I now turn to the lawfulness of the search and seizure of Boyd's vehicle and the contraband within.

Officers may conduct an 'inventory search' of a vehicle without violating the Constitution, so long as the officers conduct the search with in accordance with routine procedures or policies.[19]   Here, Murtha seized the gun and magazines (in addition to the knife and wallet) in accordance with the PSP protocol for inventory searches, which states:

> B. Custodial/Inventory Searches: Seized vehicles or other property shall be inventoried and processed whenever the property is taken into possession. When a custodial/inventory search is made of a vehicle which is taken into custody through official actions of the Department, any items of value shall be removed from the vehicle, inventoried on a Property Record Form SP-7-007, and placed in the appropriate property storage area.
>
> 1. A custodial/inventory search is the limited, warrantless search of a vehicle conducted to protect items of property carried in the vehicle from loss during storage. A custodial/inventory search shall:
>
> \*\*\*\*\*
>
> c. Be conducted on those vehicles which cannot reasonably be left where discovered:
>
> (1) For which an owner/agent cannot immediately be determined.
> (2) For which an owner/agent is not currently capable or willing to reasonably dispose of the vehicle.
> (3) For which the owner/agent is taken into custody.[20]

---

[19]   *See Florida v. Wells,* 495 U.S. 1, 4 (1990).

[20]   Government Exhibit 8 and Defendant's Exhibit 116.

The PSP initially secured Boyd's truck with the intent to leave it overnight

in the Giant Foods parking lot.  Ultimately when the truck was taken to the PSP

impound lot, the PSP needed to secure Boyd's valuables so that they were not left

exposed in the vehicle.  As such, the PSP acted in accordance with its own

protocol, specifically B(1)(c)(1) and (2), in seizing not only the gun and the loaded

magazines, but also the knife and Boyd's wallet.  Accordingly, there is no

Constitutional violation in the seizure of these items, including those Boyd could

not lawfully possess.

### E. Delay in judicial determination of probable cause

In *Corley v. United States*[21] the United States Supreme Court restated the

*McNabb*[22]*-Mallory*[23] rule, in light of Congress's enactment of 18 U.S.C. § 3501.

The statute governs the admissibility of confessions, and, as is relevant here,

subsection (c) of the statute addresses delay in presentment:

> (c) In any criminal prosecution by the United States or by the District
> of Columbia, a confession made or given by a person who is a
> defendant therein, while such person was under arrest or other detention
> in the custody of any law-enforcement officer or law-enforcement
> agency, shall not be inadmissible solely because of delay in bringing
> such person before a magistrate judge or other officer empowered to
> commit persons charged with offenses against the laws of the United
> States or of the District of Columbia if such confession is found by the
> trial judge to have been made voluntarily and if the weight to be given

---

[21]   566 U.S. 303 (2009).

[22]   *McNabb v. United States*, 318 U.S. 332 (1943).

[23]   *Mallory v. United States*, 354 U.S. 449 (1957).

the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.[24]

In *Corley*, the Supreme Court held "that § 3501 modified *McNabb–Mallory* without supplanting it."[25] "Under the rule as revised by § 3501(c), a district court with a suppression claim must find whether the defendant confessed within six hours of arrest (unless a longer delay was 'reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate judge]')."[26] "If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was 'made voluntarily and ... the weight to be given [it] is left to the jury.'"[27] "If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb–Mallory cases, and if it was, the confession is to be suppressed."[28]

---

[24]  18 U.S.C.A. § 3501.

[25]  556 U.S. at 322.

[26]  *Id.*

[27]  *Id.*

[28]  *Id.*

Trooper Murtha located Boyd in the Giant Food Store parking lot sometime after 6:00 p.m. Rasmus and Paduck, with Boyd in hand, arrived at the PSP Shickshinny barracks at approximately 6:40 p.m. Boyd was advised of his rights and signed a waiver form at approximately 7:10 p.m. Secret Service agents interviewed Boyd at approximately 8:30 p.m. Boyd was then transported out of the Shickshinny barracks at 11:49 p.m. He arrived at the on-call magistrate office in Danville, Pennsylvania at 12:30 a.m.

However, 18 U.S.C. § 3501 only applies to confessions while being held on a federal charge pending arraignment. At this point in time, Boyd was only being held pending arraignment on state charges. Section 3501 is therefore inapplicable in this case unless I accept Boyd's unsupported argument that there was collusion between federal and state agents to solicit a confession from Boyd. To support this argument, Boyd points to a two-week span between the time that the state terroristic threats charges were brought, and then dropped, in favor of the instant federal charges. Boyd makes this unfounded accusation of collusion between federal and state officers in a two-sentence reference in his brief to the case of *United States v. Alvarez-Sanchez*.[29]

---

[29]    511 U.S. 350 (1994).

*In Alvarez-Sanchez*, the Supreme Court held that § 3501(c) does not apply to statements made by a person who is being held solely on state charges.[30] "Plainly, a duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense."[31] "If [] the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated."[32] Like *Alvarez-Sanchez*, "In this case, [Boyd] was under arrest on state [] charges at the time he made his inculpatory statement to the Secret Service agents."[33] "The terms of § 3501(c) thus did not come into play until respondent was arrested by the agents on a federal charge—after he made the statement."[34] Furthermore, the *Alvarez-Sanchez* Court stated: "although we think proper application of § 3501(c) will be as straightforward in most cases as it is here, the parties identify one presumably rare scenario that might present some potential for confusion; namely, the situation that would arise if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment."[35]

---

[30]   *Id.*

[31]   *Id.* at 358.

[32]   *Id.*

[33]   *Id.* at 359.

[34]   *Id.*

[35]   *Id.*

Federal agents did not direct state officers to arrest, detain, or charge Boyd.

Both Kidder and Paduck testified that the Secret Service has no authority over the

Pennsylvania State Police.  Boyd did not elicit any testimony that suggests any sort

of collusion whatsoever between state and federal agents.  Moreover, Rasmus

testified that he had no knowledge that this case had even become a federal action.

Accordingly, I hold that there is no illicit collusion of the sort the *Alvarez-Sanchez*

was concerned with, nor even an innocent collusion between federal and state

agents who each acted independently.  Thus, there is no constitutionally violative

delay in arraigning Boyd.

### F.  Fruit of the Poisonous Tree

Finally, "in its broadest sense, the fruit of the poisonous tree doctrine has

been regarded as a rule prohibiting the government from using in any manner

prejudicial to the accused information derived from facts learned as a result of the

unlawful acts of its agents."[36]  Here, Boyd alleges that he made additional

incriminating statements to the Secret Service on August 13, 2018, and that these

statements should be suppressed under the fruit of the poisonous tree doctrine.

Because I found no unlawful acts by law enforcement, the fruit of the poisonous

tree doctrine has no application in this case.

---

[36]   43 A.L.R.3d 385 (2018) (Gary D. Spivey, J.D.).

## III.  CONCLUSION

For all of the aforementioned reasons, the motion to suppress will be denied

by separate Order.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge