# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:18-CR-00281 |
| v. | (Judge Brann) |
| JEFFREY G. BOYD, | |
| Defendant. | |

## MEMORANDUM OPINION

### FEBRUARY 11, 2019

## I.    BACKGROUND

On August 21, 2018, Jeffrey G. Boyd was indicted by the Government on one count of violating 18 U.S.C. § 922(g)(8), which states:

> (g) It shall be unlawful for any person—
>    (8) who is subject to a court order that--
>       (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>       (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>       (C)
>          (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>          (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury;

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

On December 6, 2018, Boyd filed a Motion to Dismiss the Indictment.[1] The motion has been fully briefed and is now ripe for disposition. For the reasons that follow, the motion is denied.

## II. DISCUSSION

Boyd was indicted after a complaint was filed with the Pennsylvania State Police, who ultimately turned the case over to the authority of the United States Secret Service. When he was initially located by the State Troopers, Boyd was in possession of a firearm. He subsequently admitted possessing other firearms at his home in Oklahoma with the knowledge that he was the subject of an Oklahoma Emergency Order of Protection; Boyd attached this protective order to his supporting brief as Exhibit One.

Boyd contends that the statute under which he was charged is unconstitutional as applied to him. Constitutional challenges to statutory schemes fall into one of two categories. Facial attacks argue that no application of the statute is constitutional. An as applied challenge, which the Court is faced with

---

[1] ECF No. 48.

here, is one where the movant asserts that the statute is unconstitutional "as applied" to the movant's particular circumstances.

As an initial matter, it is clear that Boyd's conduct certainly falls within the scope of Section 922(g)(8). Boyd was subject to an Emergency Order of Protection issued by the State of Oklahoma District Court for Tulsa County.[2] The March 19, 2018 protective order indicates on its face that Boyd had been, or would be provided the opportunity to be heard and that a hearing was scheduled for April 19, 2018,[3] in conformity with Section 922(g)(8)(A). Boyd does not quarrel with this in his briefing. Additionally, it is undisputed that Boyd's former spouse, the subject of the protective order, qualified as an "intimate partner" under 18 U.S.C. § 921(a)(32).

The Oklahoma protective order "restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person" as required by Sections 922(g)(8)(B) and (C)(ii).[4] The protective order also states that Boyd is "prohibited from injuring, abusing, sexually assaulting, molesting, harassing, stalking, threatening, or otherwise interfering with the protected person(s), and from use, attempted use or threatened use of physical

---

[2] Def. Ex., ECF No. 49-1.

[3] *Id.* at 1.

[4] Boyd argues in this brief that the element in subsection (C)(i) has not been met, but (i) and (ii) are written in the disjunctive, accordingly, it is sufficient that the protective order only meet the element of subsection (C)(ii).

force against the protected person(s) that would reasonably be expected to cause bodily injury."[5] Finally, Boyd does not dispute possessing the firearm in question. The indictment is therefore sufficient as charged.

Having satisfied for the record that Boyd has been properly charged, I now turn to his as-applied challenge to the statute.

The Second Amendment of the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." While the Second Amendment has been the subject of seeming endless discussion in the public forum, there has been scant development of this amendment in the way of substantive case law. I note that it was less than ten years ago that the United States Supreme Court held that the Second Amendment is incorporated against the states by the Due Process Clause of the Fourteenth Amendment.[6]

That said, it is incontestable that the Second Amendment confers the right to individuals to keep and bear arms, with limitations, as discussed by the Supreme Court in *District of Columbia v. Heller*. *Heller* notes the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and

---

[5] *Id.* at 2.

[6] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010).

- 4 -

government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[7]

Recently, in *Binderup v. Att'y Gen. United States of Am.*,[8] the United States Court of Appeals for the Third Circuit affirmed its prior Second Amendment framework set forth in *United States v. Marzzarella*.[9] When examining an as-applied Second Amendment challenge under *Marzzarella* and *Binderup*, a court in this Circuit first examines "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."[10] "If it does not, our inquiry is complete," and there is no Second Amendment violation.[11] However, if the law does burden such conduct, a court must "evaluate the law under some form of means-end scrutiny."[12] "That form in *Marzzarella* being intermediate scrutiny."[13] "If the law passes muster under that standard, it is constitutional. If it fails, it is invalid."[14]

---

[7] 554 U.S. 570, 595 and 626-27 (2008).

[8] 836 F.3d 336 (3d Cir 2016). *Binderup* is a split *en banc* decision.

[9] 614 F.3d 85 (3d Cir 2010) (Scirica, J.).

[10] *Id.* at 89.

[11] *Id.*

[12] *Id. See also Binderup* at 344 ("As to cases involving burdens on Second Amendment rights, Heller did not announce which level of scrutiny applies but cautioned that challenges based on those rights are not beaten back by the Government supplying a rational basis for limiting them.")

[13] *Binderup* at 346.

[14] *Marzzarella* at 89.

The Third Circuit has not, however, dealt specifically with an as-applied challenge to subsection (g)(8) of section 922. Therefore, I turn for guidance to a case cited with approval in *Binderup*.

In *United States v. Reese*,[15] the United States Court of Appeals for the Tenth Circuit held that an as applied challenge to an indictment for possessing firearms while subject to a domestic protection order survived intermediate scrutiny. Moreover, the *Reese* Court held that the defendant could not collaterally attack the merits of the underlying protection order.[16]

> **1. Step One: Determination whether Boyd has "adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections."[17]**

Here, Boyd argues that, despite the protective order against him, he is nevertheless a member of a class of "peaceable" and "virtuous" citizens – a class which was not historically excluded from the right to bear arms. This argument is well taken. "Most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"[18]

---

[15] 627 F.3d 792 (10th Cir 2010).

[16] *Id.* Boyd asserts in his reply brief that he is not attempting to collaterally attack the Oklahoma Emergency Order of Protection.

[17] *Id.*

[18] *Binderup*, at 348 and 362.

The threshold inquiry then is whether Section 922(g)(8) regulates conduct that falls within the scope of the Second Amendment. In other words, the Court must determine whether Boyd has "adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections."[19] As delineated in *Heller*, "the right is not unlimited, however, as the Second Amendment affords no protection for the possession of dangerous and unusual weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places."[20] "*Heller's* list of presumptively lawful regulations is not exhaustive, and accordingly, the Second Amendment appears to leave intact additional classes of restrictions."[21]

*United States v. Reese* provides somewhat abbreviated analysis as to this point; despite that, my thinking is along the same lines. The Tenth Circuit in *Reese* held that, generally, Section 922(g)(8) imposes a burden on the defendant's possession of otherwise legal firearms, such that the right falls under the guarantee set forth in the Second Amendment. "At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-

---

[19] *Binderup*, at 347.

[20] *Marzzarella*, at 92.

[21] *Id.* at 92-3. *See also Scarborough v. United States,* 431 U.S. 563, 572, (1977) ("By prohibiting possession by felons,] Congress sought to rule broadly—to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." (internal quotation marks omitted)).

defense in the home."[22]  "Prudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by *Heller*."  Section 922(g)(8)'s "prohibition of the possession of firearms" by a person subject to a protection order is "one of those regulations unmentioned by *Heller*."[23]  Given the concept that those historically prohibited from possessing weapons were 'unvirtious citizens, that is to say "any person who has committed a serious criminal offense, violent or nonviolent,"[24] I find that Boyd, the subject of a protective order, is not in that class of persons.

The process for issuance of a protective order is admittedly much less involved than a criminal conviction.  Often, an initial protective order is issued *ex parte*, without advance notice to the subject, and with only the statement of the alleged victim in support, until such time a hearing may be held.  That is the case here.

Whereas those 'unvirtuous' individuals historically barred from possessing firearms were those who have been afforded the full panoply of Constitutional protections for an accused – a fair trial, before a jury of ones peers, represented by counsel, with the opportunity to confront witnesses – it is easy to suggest that the

---

[22] *Id.* at 92.

[23] *Id.* at 93.

[24] *Binderup*, at 348.

subject of a protective order is not in the same class of 'unvirtuous citizens' as an individual who has been adjudicated guilty of a criminal offense.[25] I find then that Boyd has met his burden of showing that he is within the class of individuals who maintain a Second Amendment right to bear arms. The burden now shifts to the Government to demonstrate that the statute's purpose is "important and the means to achieve it substantially related."[26]

> **2. Step Two: "The burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny."[27]**

### a. Intermediate scrutiny applies

Although the Tenth Circuit provided limited guidance as to step one in *Reese*, its analysis as to step two is both thorough and instructive regarding whether intermediate or strict scrutiny should apply. In holding that intermediate scrutiny is the appropriate mode of analysis, the *Reese* Court explained, as follows:

> We must apply some level of heightened scrutiny and, in doing so, must look to analogous cases for guidance on precisely what level to apply.
>
> In recent months, both the Third and Seventh Circuits have applied intermediate scrutiny to Second Amendment challenges to federal firearm laws. In *Marzzarella*, the Third Circuit, citing analogous First Amendment cases, concluded that "[w]hether or not strict scrutiny may

---

[25] Similarly, nor do I find that Boyd as the subject of a protective order is in other classes of individuals historically subject to disarmament – the mentally ill, those prohibited from carrying firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

[26] *Binderup*, at 341.

[27] *Id*, at 347.

apply to particular Second Amendment challenges, it is not the case that it must be applied to all Second Amendment challenges." 614 F.3d at 96. In other words, the Third Circuit concluded, "the Second Amendment can trigger more than one particular standard of scrutiny," depending, at least in part, upon "the type of law challenged and the type of [Second Amendment restriction] at issue." *Id*. at 97. The Third Circuit in turn concluded that the specific statute it was reviewing, 18 U.S.C. § 922(k), which prohibits the possession of firearms with obliterated serial numbers, "should be evaluated under intermediate scrutiny" because "[t]he burden imposed by the law d[id] not severely limit the possession of firearms," as did "[t]he District of Columbia's handgun ban" that was at issue in *Heller*. *Id*. Turning again to analogous First Amendment cases, the Third Circuit framed the intermediate scrutiny inquiry in this way: whether the challenged law served a "significant," "substantial," or "important" governmental interest, and, if so, whether the "fit between the challenged [law] and the asserted objective [wa]s reasonable, not perfect." *Id*. at 98. And, finally, the Third Circuit concluded that "[t]hose requirements [we]re met" because the purpose of § 922(k), i.e., "preserving the ability of law enforcement to conduct serial number tracing ... constitute[d] a substantial or important interest," id., and § 922(k) "fit[ ] reasonably with that interest," *id*., by "[r]egulating the possession of unmarked firearms-and no other firearms," *id*. at 99.

In *Skoien*, the Seventh Circuit sitting *en banc*, applied a similar test and reached a similar result with respect to a different statute, 18 U.S.C. § 922(g)(9), which prohibits any person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing firearms. In doing so, the Seventh Circuit first inferred from Heller "that exclusions [on firearm possession] need not mirror limits that were on the books in 1791" and "that some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Skoien*, 614 F.3d at 641. In turn, the Seventh Circuit, citing cases involving analogous constitutional rights, concluded that § 922(g)(9) was subject to intermediate scrutiny and framed the inquiry in this way: whether the statute was "substantially related to an important governmental objective." *Id*. In answering that inquiry, the Seventh Circuit held that "the goal of § 922(g)(9), preventing armed mayhem,

[wa]s an important governmental objective" and that "[b]oth logic and data establish[ed] a substantial relation between § 922(g)(9) and this objective." *Id*. at 642.

The initial question we must address is whether intermediate scrutiny is also appropriate for the statute challenged by Reese. To be sure, § 922(g)(8) is arguably more restrictive than § 922(k), the statute at issue in *Marzzarella*, in that it prohibits the possession of all types of firearms. On the other hand, however, § 922(g)(8) is less restrictive than § 922(k) in that it applies only to a narrow class of persons, rather than to the public at large. And, in that regard, § 922(g)(8) is substantially similar to § 922(g)(9), the statute at issue in *Skoien*. Specifically, both statutes prohibit the possession of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in domestic violence. Based upon these characteristics, we conclude that § 922(g)(8), like the statutes at issue in *Marzzarella* and *Skoien*, is subject to intermediate scrutiny.[28]

The United States Court of Appeals for the Seventh Circuit explained that "to pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective."[29]

### b. 18 U.S.C. § 922(g)(8) has an important objective.

The Government has likened this case to *Marzzarella*. I respectfully disagree. *Marzzarella* dealt with Section 922(k), possession of a firearm with an obliterated serial number. The objective of Section 922(g)(8) is substantially different from the objective of Section 922(k).

---

[28] *Reese,* at 801-02.

[29] *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010).

To parse this statutory language, I turn again to the analysis delineated in *Reese*. The Tenth Circuit explained in *Reese* that, "the objective of § 922(g)(8) is to keep firearms out of the hands 'of people who have been judicially determined to pose a credible threat to the physical safety of a family member, or who have been ordered not to use, attempt to use, or threaten to use physical force against an intimate partner or child that would reasonably be expected to cause bodily injury,' because 'such persons undeniably pose a heightened danger of misusing firearms.'"[30] In order to reach this conclusion, the *Reese* Court relied on *United States v. Skoien*, a case from the Seventh Circuit that, "though focused on § 922(g)(9) rather than § 922(g)(8), points to evidence that is highly relevant to, and supportive of, the government's assertion that the restriction imposed by § 922(g)(8) is substantially related to an important government objective."[31]

The *Skoien* Court stated:

> That firearms cause injury or death in domestic situations also has been established. Domestic assaults with firearms are approximately twelve times more likely to end in the victim's death than are assaults by knives or fists. Linda E. Saltzman, James A. Mercy, Patrick W. O'Carroll, Mark L. Rosenberg & Philip H. Rhodes, Weapon Involvement and Injury Outcomes in Family and Intimate Assaults, 267 J. Am. Medical Ass'n 3043 (1992). Part of this effect stems from the fact that some would-be abusers go buy a gun, see Susan B. Sorenson & Douglas J. Wiebe, Weapons in the Lives of Battered Women, 94 Am. J. Pub. Health 1412 (2004), and much from the fact that guns are more lethal

---

[30] *Reese*, at 802.

[31] *Id.*

than knives and clubs once an attack begins. See [Franklin E. Zimring, Firearms, Violence, and the Potential Impact of Firearms Control, 32 J.L. Med. & Ethics 34 (2004) (collecting studies) ]. The presence of a gun in the home of a convicted domestic abuser is "strongly and independently associated with an increased risk of homicide." Arthur L. Kellermann, et al., Gun Ownership as a Risk Factor for Homicide in the Home, 329 New England J. Medicine 1084, 1087 (1993). See also, e.g., Jacquelyn C. Campbell, et al., Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1090 (2003); James E. Bailey, et al., Risk Factors for Violent Death of Women in the Home, 157 Archives of Internal Medicine 777 (1997); Douglas J. Wiebe, Homicide and Suicide Risks Associated with Firearms in the Home: A National Case-Control Study, 41 Annals of Emergency Medicine 771 (2003). And for this purpose the victims include police as well as spouses, children, and intimate partners. Responding to a domestic-disturbance call is among an officer's most risky duties. Approximately 8% of officers' fatalities from illegal conduct during 1999 through 2008 arose from attempts to control domestic disturbances. FBI, Law Enforcement Officers Killed and Assaulted 2008 Table 19 (2009).

Finally, the recidivism rate is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers. For example, a study of persons arrested for misdemeanor domestic violence in Cincinnati concluded that 17% of those who remained in the area were arrested again for domestic violence within three years. John Wooldredge & Amy Thistlethwaite, Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity vi (1999). The full recidivism rate includes violence that does not lead to an arrest. Estimates of this rate come from survey research and range from 40% to 80% "when victims are followed longitudinally and interviewed directly." Carla Smith Stover, Domestic Violence Research, 20 J. Interpersonal Violence 448, 450 (2005). See also Julia C. Babcock, et al., Does Batterers' Treatment Work? A Meta-Analytic Review of Domestic Violence Treatment, 23 Clinical Psychology Rev. 1023, 1039 (2004) (estimating a 35% recidivism rate based on partners' reports). Skoien cites, as if it were favorable, a study showing that within three years of conviction 48% of domestic abusers "suspended" their abusive conduct-which means that the other 52% did not, and that

even the 48% may have committed new crimes within three years after conviction. John H. Laub & Robert J. Sampson, Understanding Desistance from Crime, 28 Crime & Justice 1, 31 (2001). No matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners.[32]

I adopt the *Reese* Court's statement of the objective of Section 922(g)(8) and conclude that the Government has met its burden in this case.

### c. The objective of 18 U.S.C. § 922(g)(8) is advanced by means substantially related to its objective.

My next task in applying intermediate scrutiny is to determine whether subjecting Boyd to Section 922(g)(8) is substantially related to this objective. The Government, cautiously applying a strict scrutiny standard, argues that:

> Section 922(g)(8) is aimed at prohibiting access to firearms by persons found to have harassed, stalked, threatened the physical safety of, or otherwise represented a credible threat to the physical safety of an intimate partner or children. 18 U.S.C. § 922(g)(8)(C)(i) and (C)(ii). Reducing domestic violence is a compelling government interest. Because § 922(g)(8) is narrowly tailored to serve that interest, it is constitutionally valid. *Lippman*, 369 F.3d at 1044 (even if Second Amendment protected. individual right to bear arms, § 922(g)(8) would be constitutional because "Congress had a compelling government interest in enacting § 922(g)(8) to decrease domestic violence."; *see also United States v. Luedtke*, 589 F. Supp. 2d 1018, 1021 (E.D.Wis. 2008) (§ 922(g)(8) constitutional following *Heller* because of compelling interest in reducing domestic violence); Knight, 574 F. Supp. 2d at 226 (same).[33]

---

[32] *Reese*, at 802–03, *citing United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009).

[33] Govt. Br. ECF No. 59 at 18.

I agree that Section 922(g)(8) is substantially related to the Government's interest in prohibiting access to firearms to persons who have found to have harassed, stalked, threatened the physical safety of, or otherwise represented a credible threat to the physical safety of an intimate partner or child. I conclude therefore that the prosecution of Boyd under § 922(g)(8) is consistent with the Government's intended purpose in implementing the statute. Because the statute and its objective as applied to Boyd pass muster under an intermediate scrutiny review, the motion to dismiss the indictment as unconstitutional is denied.

## III. CONCLUSION

In sum, I hold that the Government has not violated Boyd's Second Amendment rights, as 18 U.S.C. § 922(g)(8) is not unconstitutional as applied to Boyd. The indictment will consequently not be dismissed.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge